IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

ESTATE OF MARTHA BAROTZ, by its )
Executor Nathan Barotz, )
     )
       Plaintiff, )   C.A. No.:  N20C-04-126 EMD CCLD
     )
       v. )
     )
MARTHA BAROTZ 2006-1 )
INSURANCE TRUST, LIFE )
ACCUMULATION TRUST III, and )
HELIX CAPITAL FUNDING, LLC )
     )
       Defendants. )

Submitted: August 28, 2023
Decided: December 18, 2023

*Upon Consideration of Plaintiff Estate of Martha Barotz, by its Executor Nathan Barotz, Motion for Summary Judgment*
***GRANTED***

Donald L. Gouge, Jr., Esquire, Donald L. Gouge, Jr., LLC, Wilmington, Delaware.  *Attorneys for Plaintiff Estate of Martha Barotz, by its Executor Nathan Barotz*

Steven L. Caponi, Esquire, Matthew B. Goeller, Esquire, K&L Gates LLP, Wilmington, Delaware.  *Attorneys for Defendants Martha Barotz 2006-1 Insurance Trust, Life Accumulation Trust III and Helix Capital Funding, LLC.*

**DAVIS, J.**

## I.      INTRODUCTION

This is a civil action filed before the Complex Commercial Litigation Division of this

Court.  Plaintiff Estate of Martha Barotz, by its Executor Nathan Barotz[1] (the "Estate"),

commenced this action against Defendants Martha Barotz 2006-1 Insurance Trust (the "Trust"),

Life Accumulation Trust III ("LATIII"), and Helix Capital Funding, LLC ("HCF," and together

---

[1] By Order entered on September 5, 2023, the Court substituted Nathan Barotz, as the Executor of the Estate of Martha Barotz, for Peter Barotz, former executor of the Estate. (D.I. No. 124)  Peter Barotz passed away on June 2, 2023 and Nathan Barotz is the duly named successor executor of the Estate.

with the Trust and LATIII, "Defendants") on April 15, 2020. The Estate alleges that Defendants received insurance proceeds from a life insurance policy (the "Policy") which was procured without an insurable interest *via* a stranger-owned life insurance ("STOLI") scheme, which are void *ab initio* under Delaware law.[2] The Estate seeks recovery of those insurance proceeds under 18 *Del. C.* § 2704 ("Section 2704"), or in the alternative, under the theory of unjust enrichment. The Estate filed its Motion for Summary Judgment (the "Motion") on May 4, 2021.

For the reasons set forth below, the Motion is **GRANTED**.

## II.     RELEVANT FACTS

### A.  PARTIES

The Estate is a citizen of the State of New York.[3] The Surrogate's Court for the State of New York, County of Westchester appointed Mr. Barotz as the Executor of the Estate.[4]

The Trust is a Delaware statutory trust, formed pursuant to the Delaware Statutory Trust Act, 12 *Del. C.* §§ 3801, *et seq.*, with Wilmington Savings Fund Society FSB as its trustee, having its principal place of business in Greenville, Delaware.[5]

LATIII is a Delaware statutory trust, formed pursuant to the Delaware Statutory Trust Act, 12 *Del. C.* §§ 3801, *et seq.*, with its principal place of business in Wilmington, Delaware.[6]

HCF is a Delaware limited liability company with its registered agent in Wilmington, Delaware.[7]

---

[2] Compl. ¶ 7 (D.I. No. 1).
[3] *Id.* ¶ 1.
[4] D.I. No. 123 ¶ 5.
[5] Compl. ¶ 2.
[6] *Id.* ¶ 3.
[7] *Id.* The Estate describes HCF as a "STOLI promotor . . .whose purpose was . . . to initiate, procure, and aggregate a large portfolio of life insurance policies for the benefit of other STOLI promotors and/or investors such as LATIII." Compl. ¶ 12.

## B. THE LIFE ACCUMULATION PROGRAM

LATIII, a Delaware trust created in 2005, operated the Life Accumulation Program (the "Program") which invited certain "qualified" senior citizens to create Delaware statutory trusts which would then be utilized to acquire life insurance policies on their behalf.[8] LATIII provided all of the capital to the trusts to pay for the premiums on the policies.[9] In addition, LATIII was made the initial "sole beneficiary" of the trust, with power to transfer the policies to other secondary market purchasers.[10] The senior citizens who participated in the Program received 3% of the face value of the life insurance policies taken out by LATIII via the Delaware statutory trusts.[11]

## C. THE POLICY

Martha Barotz, a retiree in her early seventies residing in New Rochelle, New York at the time, was induced by HCF and LATIII in 2006 to procure a life insurance policy on her life for the benefit of LATIII through the Program (the "Policy").[12] At the direction of LATIII and its agents, including HCF, Ms. Barotz executed a trust agreement on August 18, 2006 to establish the Trust, pursuant to the Delaware Statutory Trust Act, 12 *Del. C.* §§ 3801, *et seq.*[13]

On August 11, 2006, Ms. Barotz and her husband, Peter Barotz, signed a Disclosure Statement and Consent form for the purposes of creating the trust (the "Disclosure").[14] As the Estate notes, the Disclosure established that: "(i) with a mere $100 contribution, the Trust would be established in Delaware; (ii) the Trust would 'apply for, purchase, hold and/or transfer' the

---

[8] Plaintiff's Motion for Summary Judgment ("Mot.") at 5 (D.I. No. 88)..
[9] *Id.* at 5-6.
[10] *Id.*
[11] *Id.* at 6.
[12] Compl. ¶ 17.
[13] *Id.* ¶ 21.
[14] Compl. Ex. A.

3

Policy; (iii) LATIII would provide 'capital to the Trust' so that the Trust could 'make the initial premium payments due under the Polic[y]'; (iv) in exchange for paying the premiums, LATIII would 'receive the sole beneficial interest in the Trust;' and (v) LATIII would have 'discretion' to transfer the Trust and the Policy to various 'institutional buyers.'"[15] The Disclosure also provided that a third party investor with an "economic interest" in the death of Ms. Barotz could own any life insurance policies procured on Ms. Barotz's life through the Program.[16]

On August 18. 2006, Ms. Barotz executed a trust agreement creating the Trust.[17] Ms. Barotz also designated the Christiana Bank & Trust Company (now WSFS) as the trustee of the Trust, with Cedric Strother serving as the trust officer.[18]

On August 23, 2006, the Trust submitted a life insurance application for the Policy, and on September 3, 2006, the Policy was issued to the Trust in the amount of $5 million, with the effective date of September 3, 2006.[19] Ms. Barotz received $150,000 for her participation in the Program. On April 14, 2011, LATIII sold the beneficial interest in the Trust to a Delaware entity called Financial Credit Investment I Trust C-3 ("FCI"), which the Estate alleges is an entity under control of Apollo Management, L.P. ("Apollo").[20]

On December 22, 2018, Ms. Barotz passed away, and thereafter, the Trust received the benefits of the Policy in the amount of $5,042,328.77 on April 1, 2019.[21] As alleged, the benefits of the Policy were "ultimately transferred to Apollo, which is still in possession of those proceeds."[22]

---

[15] Mot. at 6 (citing Compl. Ex. A).
[16] Mot. at 7 (citing Compl. Ex. A).
[17] Compl. Ex. B.
[18] *Id.*
[19] Compl. ¶¶ 27-31, Compl. Exs. I, J.
[20] Mot. at 9.
[21] *Id.*
[22] *Id.*

### D. PRESENT LITIGATION

On April 15, 2020, the Estate filed its Complaint asserting claims for: (i) recovery of insurance proceeds due to lack of insurable interest; and (ii) in the alternative, unjust enrichment.[23] On July 22, 2020, Defendants filed their Motion to Dismiss, or in the Alternative, for a Stay.[24] On August 28, 2020, the Estate filed its Response to the Motion to Dismiss.[25] On September 11, 2020, Defendants filed their Reply Brief in Support of its Motion to Dismiss.[26] The Court held oral arguments on the Motion to Dismiss on October 26, 2020.[27] On December 4, 2021, the Court denied the Motion to Dismiss.[28]

On December 22, 2020, Defendants filed their Answer asserting affirmative defenses, and a Third Party Complaint alleging six counterclaims against the Estate.[29] On January 25, 2021, the Estate filed its Answer to the Trust's counterclaims.[30]

On February 14, 2021, Defendants filed a Motion for Judgment on the Pleadings.[31] On March 15, 2021, the Estate filed its Response to the Motion for Judgment on the pleadings.[32] On March 29, 2021, Defendants filed its Reply Brief in support of its Motion for Judgment on the Pleadings.[33] On July 30, 2021, the Court denied the Motion for Judgment on the Pleadings.[34]

---

[23] D.I. No. 1.
[24] D.I. No. 11. For context, Defendants argued that because there was a concurrent New York action based on the same facts and involving the same parties, the present action should be stayed in favor of the New York action.
[25] D.I. No. 19.
[26] D.I. No. 27.
[27] D.I. No. 41.
[28] D.I. No. 58. For context, the Court denied the motion based on the New York Supreme Court's dismissal of the New York action due to lack of justiciability under New York law, and because interests of Delaware predominated the case, the New York Supreme Court found that the matter should proceed in Delaware, not New York.
[29] D.I. No. 62.
[30] D.I. No. 67.
[31] D.I. No. 74.
[32] D.I. No. 80.
[33] D.I. No. 85.
[34] D.I. No. 104.

On May 10, 2021, Defendants filed their Motion to Stay in relation to the pending Delaware Supreme Court's rulings on certified questions of law in *Lavastone Capital LLC v. Estate of Beverly E. Berland* as to the application of 18 Del. C. § 2704 in Delaware courts.[35]  The Estate filed its Response to the Motion to Stay on May 14, 2021.[36]  On May 28, 2021, Defendants filed its Reply Brief in Support of Its Motion to Stay.[37]  The Estate filed its Sur-Reply in Opposition to the Motion to Stay on June 3, 2021.[38]  The Court held oral arguments on the Motion to Stay on July 19, 2021.[39]  On July 20, 2021, the Court denied the Motion to Stay.[40]

The Estate filed the instant Motion on May 4, 2021.[41]  Defendants filed its Opposition to the Motion on July 13, 2021[42]  On December 17, 2021, the Estate filed its Reply Brief in Support of the Motion.[43]  On January 14, 2022, Defendants filed its Sur-Reply in Opposition to the Motion for Summary Judgment.[44]  The Court held a hearing on the Motion on August 28, 2023. At the conclusion of the hearing, the Court took the Motion under advisement.

### III.    PARTIES' CONTENTIONS

#### A.  THE MOTION

The Estate argues that, under Delaware's long-standing common law prohibition against human life wagers and Section 2704, the Policy in question was void *ab initio* because it was an

---

[35] D.I. No. 89.
[36] D.I. No. 90.
[37] D.I. No. 91.
[38] D.I. No. 93.
[39] D.I. No. 99.
[40] D.I. No. 100.
[41] D.I. No. 88.
[42] D.I. No. 97.
[43] D.I. No. 114.
[44] D.I. No. 115.

illegal STOLI scheme designed to be a prohibited wager on human life.[45] As such, the Estate

contends that all proceeds from the Policy should be returned to the Estate.[46]

The Estate maintains that, since 1897, gambling on human life expectancy has been

illegal in Delaware.[47] The Estate notes that Delaware common law has "long provided that 'a

person having no insurable interest in the life of another shall not be permitted to speculate on

such life.'"[48] The Estate asserts that this legal premise was later codified by the adoption of

Section 2704 in 1968, and reaffirmed by the Supreme Court's decision in *Price Dawe*—a

decision that clarified that any human life wagers, including STOLI schemes, were illegal under

Delaware's Constitution, and reinforced the insurable-interest requirement for life insurance

policies in Delaware.[49]

The Estate emphasizes that the Policy was designed from the beginning to: (i) feign

technical compliance with Delaware insurable interest statutes by creating a "sham trust" which

was used by the Defendants to pay all of the premiums on the Policy; (ii) gain the sole

beneficiary rights to any and all insurance policies acquired on the life of Ms. Barotz through the

Trust; and (iii) maintain the exclusive power to sell and transfer the said policies to third-

parties.[50] The Estate argues that, as the *Price Dawe* Court found, a trust "created through

nominal funding as a mere formality" or used as a "cover for a waging contract" lacks the

necessary insurable interest as measured under Section 2704(c)(5), and is void.[51]

Additionally, the Estate contests Defendants' affirmative defenses and counterclaims.

The Estate contends that Defendants' attempt to shift the "blame" of the fraudulent STOLI

---

[45] Compl. ¶ 7.
[46] *Id*. ¶ 8.
[47] *Id*. at 9.
[48] *Id*. at 10 (citing *Balt. Life Ins. Co. v. Floyd*, 91 A. 653, 656 (1914)).
[49] *Id*. at 10.
[50] *Id*. at 13-14.
[51] *Id*. at 15-16.

scheme to Ms. Barotz by claiming she relinquished all claims to the Policy, has "unclean hands," and breached the contract are futile in face of Delaware's broad constitutional prohibition against human life wagers, and Section 2704.[52]  The Estate asserts that the Estate is not bound by anything that Ms. Barotz signed or agreed to, as Section 2704(b) plainly authorizes a decedent's estate to bring claims independent from the rights of the insured prior to their death.[53]  The Estate argues that, even if the Estate could be subject to the Defendants' defenses and counterclaims arising from Ms. Barotz's participation in the Policy, Delaware's public policy against human life wagers prohibits a third-party from benefiting from a STOLI scheme, and Defendants' affirmative defenses and counterclaims fail.[54]

Finally, the Estate notes that the Delaware General Assembly decided that, when faced with payment of a wagering policy between the estate and a stranger, Delaware's public policy is "best served by awarding that money to the insured's loved ones."[55]  As such, the Estate asserts that Delaware courts have long awarded STOLI proceeds to the insureds' families, even if the insureds participated, and profited, from the scheme.[56]

The Estate filed several supplemental briefings in support of its motion, offering caselaw recently decided in Delaware regarding STOLI schemes and the application of Section 2704.[57]

---

[52] *Id.* at 22.
[53] *Id.*
[54] *Id.* at 23-24.
[55] *Id*. at 24.
[56] *Id.* at 25, n.8 (collecting authorities).
[57] *See, e.g.,* D.I. No. 109 (providing the Delaware Supreme Court's answers to certification of questions of law from the District Court of Delaware raised in *Lavastone Capital LLC v. Estate of Beverly E. Berland*); D.I. No. 116 (providing the Delaware Supreme Court's answers to certifications of questions of law from the Court of Appeals for the Eleventh Circuit); and D.I. No. 117 (providing the District Court of Delaware's decision in *Lavastone Capital LLC v. Estate of Beverly E. Berland*).

## B. THE OPPOSITION

Defendants argue that summary judgment is premature because there are disputed issues of material fact not yet resolved, and that discovery is necessary to resolve the remaining questions of fact in the case.[58]

Defendants contend that even if summary judgment was not premature, the Estate failed to meet its burden in showing that summary judgment is proper at this time. Defendants state that the Estate failed to meet its burden in dismissing Defendants' counterclaims and affirmative defenses raised in its Answer relating to Ms. Barotz, Peter Barotz, and Nathan Barotz's "clear participation" and "central role" in the procurement of the Policy.[59] Essentially, Defendants claim that Ms. Barotz, in a conspiracy with her husband and son, was the main driving force in procuring the Policy for her own benefit, and that the Estate cannot cleanse her "unclean hands" in the transaction and claim ownership over the Policy proceeds.[60] In support, Defendants cite *Burns v. Ferro*, "[a] plaintiff who participates in a fraudulent scheme may not sue and recover for injuries that arise out of the same transaction."[61]

Additionally, Defendants maintain that Ms. Barotz and Peter Barotz "expressly relinquished any right to the Policy's death benefit for themselves ***and their respective estates***; consented to a judgment against them ***and their respective estates*** if any legal action was initiated by either of them or their estates involving the Policy or Trust."[62] Defendants state that

---

[58] Defendants' Answering Brief in Opposition to Plaintiff's Motion for Summary Judgment ("Opp.") at 13-15 (D.I. No. 97). Defendants also argued that summary judgment would be premature before the Delaware Supreme Court's determination in *Berland*, but as the Supreme Court has already ruled in *Berland* at this time, Defendants' arguments to that point will not be discussed.

[59] *Id*. at 18-25.

[60] *Id.* at 22-23 ("The Estate's claims are an attempt by co-conspirators – Martha, Peter, and Nathan Bartoz- to further profit from their own participation in what the Estate now calls an 'illegal' scheme . . . Only Ms. Barotz could have signed the relevant documents, including the Policy application, to procure the Policy on her own life.").

[61] *Id.* at 23 (citing *Burns v. Ferro*, 1991 WL 53834, at *2 (Del. Super. Mar. 28, 1991)).

[62] *Id.* at 26 (emphasis in original).

these agreements bars the Estate's claims now brought against Defendants, and the Estate's attempts to characterize these waivers as mere generic boilerplate language fails, particularly as Ms. Barotz, Peter Barotz, and Nathan Barotz are not "unsophisticated actors."[63] Defendants note that Ms. Barotz had procured additional life insurance policies, Peter Barotz was the CEO of multiple companies in the past, and Nathan Barotz is and was at the relevant timeframe, a New York attorney.[64] Defendants characterize the Barotzs as "veterans of the secondary life insurance marketplace."[65] Defendants argue that Ms. Barotz and Peter Barotz "knowingly relinquished any rights to the Policy proceeds" and thus the Estate's claims are barred.[66]

Defendants also contend that the Estate's assumption that Delaware law applies to the Policy is misplaced, noting that the Estate is a citizen of New York, Nathan Barotz in his capacity as the executor of the Estate resides in New York, Ms. Barotz was a resident of New York at the time the Policy was acquired and at time of her death, the Policy was signed in New York, and all relevant documents relating to the Policy were executed in New York.[67] Defendants contend that, at minimum, there is a pertinent and material question as to which choice of law applies, as New York's insurable interest requirements conflict with Delaware's, because New York "permits a person to procure an insurance policy on his or her own life and immediately transfer it to one without an insurable interest in that life, even where the policy was obtained for just such a purpose."[68]

---

[63] *Id.* at 28.
[64] *Id.* at 28, 30.
[65] *Id.*
[66] *Id.* at 29.
[67] *Id.* at 30.
[68] *Id.* at 31 (citing *Kramer v. Phoenix Life Ins. Co.,* 15 N.Y.3D 535, 536 (N.Y. 2010)).

## IV. STANDARD OF REVIEW

The standard of review on a motion for summary judgment is well-settled. The Court's principal function when considering a motion for summary judgment is to examine the record to determine whether genuine issues of material fact exist, "but not to decide such issues."[69] Summary judgment will be granted if, after viewing the record in a light most favorable to a nonmoving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[70]

If, however, the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record, then summary judgment will not be granted.[71] The moving party bears the initial burden of demonstrating that the undisputed facts support his claims or defenses.[72] If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for the resolution by the ultimate fact-finder.[73]

## V. DISCUSSION

### A. THE POLICY IS VOID *AB INITIO* AND SUMMARY JUDGMENT SHOULD BE GRANTED.

### 1. Recent STOLI caselaw

Delaware courts have extensively written on STOLIs in the last few years, including by this Court in *Estate of Martha Bartoz, by its Executor, Peter Barotz v. Vida Longevity Fund,*

---

[69] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (internal citations omitted); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. 1973).
[70] *Id.*
[71] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962); *see also Cook v. City of Harrington*, 1990 WL 35244, at *3 (Del. Super. Feb. 22, 1990) (citing *Ebersole*, 180 A.2d at 467) ("Summary judgment will not be granted under any circumstances when the record indicates . . . that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").
[72] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1970) (citing *Ebersole*, 180 A.2d at 470).
[73] *See Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).

11

*L.P.*, where the Court analyzed the same STOLI issues involving the same plaintiff as in the present action.[74] Accordingly, the Court's review of the law below will closely mirror its review of the law in *Vida Longevity Fund, L.P.*

"For hundreds of years, the law has prohibited wagering on human life through the use of life insurance that was not linked to a demonstrated economic risk."[75] Delaware codified the requirement that a person procuring a life insurance policy must have an "insurable interest" in the life of the insured in Section 2704. Section 2704(a) provides:

> Any individual of competent legal capacity may procure or effect an insurance contract upon his or her own life or body for the benefit of any person, but no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured.

The categories of persons that have an insurable interest in an individual's life include the individual insured and others, such as close family members or business associates and the "trustee of a trust created and initially funded by" the insured.[76]

In *Price Dawe*, the Supreme Court of Delaware answered three certified questions regarding the application of Section 2704 to STOLI schemes. First, the Supreme Court held that "a life insurance policy lacking an insurable interest is void as against public policy and thus never comes into force."[77] Therefore, an insurer could challenge the validity of a life insurance policy based on a lack of insurable interest after the expiration of the contractual two-year contestability period required by 18 *Del. C.* § 2908.[78]

---

[74] 2022 WL 16833545 (Del. Super. Nov. 9, 2022).
[75] *Lavastone Cap. LLC v. Est. of Berland*, 266 A.3d 964, 967–68 (Del. 2021).
[76] *Id.* at 968 (citing 18 *Del. C.* § 2704(c)).
[77] *Id.* (quoting *Price Dawe*, 28 A.3d 1059, 1065 (Del. 2011)).
[78] *Vida*, 2022 WL 16833545, at *6.

Second, the Supreme Court held that Sections 2704(a) and (c)(5) do not prohibit an insured from procuring or effecting a policy on his or her own life and immediately transferring the policy, or a beneficial interest in a trust that owns and is the beneficiary of the policy, to a person without an insurable interest in the insured's life.[79] Such a transfer was valid so long as (i) the insured procured or effected the policy and (ii) the transaction is not a mere cover for a wager.[80]

Third, the Supreme Court held that a trust established by an individual insured has an insurable interest in the life of that insured when, at the time of the application for the life insurance, the individual intends that the beneficial interest in the trust would be transferred to a third-party investor with no insurable interest in the individual's life following the issuance of the policy.[81] This is only true, however, if the individual insured created and funded the trust.[82]

In 2021, the Supreme Court answered three more certified questions in *Lavastone Cap. LLC v. Est. of Berland*. The Supreme Court addressed the first question posed by the District Court of Delaware:

> If an insurance contract is void *ab initio* under 18 *Del. C.* § 2704(a) and *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust*, 28 A.3d 1059 (Del. 2011), is any resulting death-benefit payment made "under any contract" within the meaning of 18 *Del. C.* § 2704(b)?[83]

The Court answered:

> Yes, a death-benefit payment that is made on a policy that is void *ab initio* under 18 *Del. C.* § 2704(a) and *PHL Variable Insurance Co. v. Price Dawe 2006*

---

[79] *Id.* at 969 (citing *Price Dawe*, 28 A.3d at 1068).
[80] *Id.*
[81] *Id.* (citing *Price Dawe*, 28 A.3d at 1076).
[82] *Id.*
[83] *Id.* at 966. Section 2704(b) reads:
> If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement or injury of the individual insured, the individual insured or his or her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.

13

*Insurance Trust* is made "under [a] contract" within the meaning of 18 *Del. C.* § 2704(b).[84]

The Supreme Court further explained that, in light of the Court's decision in *Price Dawe*, the intent of the General Assembly by including the word "contract" in Section 2704(b) is likely a reference to "the documents that defines the death benefit and identifies the 'beneficiary, assignee, or other payee,' rather than to mean that an enforceable contract must exist before an estate can recover death benefits paid on a policy that lacks an insurable interest."[85] In other words, a STOLI policy constitutes "contract" within the meaning of Section 2704(b), giving enforceability of Section 2704 to cases involving STOLI schemes and life-wagers made by parties lacking insurable interest.

The Supreme Court analyzed the second question posed:

Does 18 *Del. C.* § 2704(a) and (c)(5) forbid an insured or his or her trust to procure or effect a policy on his or her own life using a non-recourse loan and, after the contestability period has passed, transfer the policy, or a beneficial interest in a trust that owns the policy, to a person without an insurable interest in the insured's life, if the insured did not ever intend to provide insurance protection beyond the contestability period?[86]

The Supreme Court answered:

No, so long as the use of nonrecourse funding did not allow the insured or his or her trust to obtain the policy "without actually paying the premiums" and the insured or his or her trust procured or effected the policy in good faith, for a lawful insurance purpose, and not as a cover for a wagering contract.[87]

The Supreme Court further explained that the analysis in *Price Dawe* emphasizes two considerations when evaluating whether a policy lacks an insurable interest: (i) whether the insured or the trustee of the insured's trust obtained the policy in good faith for a lawful

---

[84] *Berland*, 266 A.3d at 967.
[85] *Id.* at 970-971.
[86] *Id.* at 971.
[87] *Id.* at 966.

insurance purpose, and not as a cover for a wagering contract; and (ii) the source of the funding

for the premiums.[88]  The Supreme Court found that the certified question effectively asked how

these considerations apply where: (i) the source of the funding is a nonrecourse loan and not any

assets of the insured; and;(ii) the insured's intent was to transfer ownership after the end of the

contestability period, rather than "immediately" as in *Price Dawe*.[89]  The Supreme Court

explained that "*Price Dawe* directs courts to determine who procured a policy by examining

'who pays the premiums.'"[90]

> Regarding the use of premium financing, the Supreme Court held:

> If used to facilitate procurement of a policy for a legitimate insurance purpose, such as estate planning, then premium financing is a recognized and permissible tool.  But the use of such financing might also be evidence of an impermissible STOLI scheme, especially where the use of a nonrecourse loan means that a third party, and not the insured, bears the entire financial liability for obtaining the policy.  The use of a nonrecourse loan to fund the premium therefore is not dispositive, but should be viewed in the context of the entire transaction and in conjunction with consideration of whether the insured intended, when obtaining the policy, "to purchase the policy for lawful insurance purposes, and not as a cover for a [wagering] contract."  If the use of nonrecourse funding allows the insured— individually or as settlor or grantor of a trust—to obtain the policy "without actually paying the premiums," then the requirements of §§ 2704(a) and (c)(5) are not met.
> *      *      *
> For these reasons, our answer to the second certified question is No, so long as the use of nonrecourse funding did not allow the insured or his or her trust to obtain the policy "without actually paying the premiums" and the insured or his or her trust procured or effected the policy in good faith, for a lawful insurance purpose, and not as a cover for a wagering contract.[91]

> Lastly, the Supreme Court analyzed the third question posed:

> May an estate profit under 18 *Del. C.* § 2704(b) if an insurance policy in violation of 18 *Del. C.* § 2704(a) was procured in part by fraud on the part of the decedent and the decedent profited from the previous sale of the policy?[92]

---

[88] *Id.*
[89] *Id.* at 971–72.
[90] *Id.* at 972.
[91] *Id.* at 972–73.
[92] *Id.* at 966.

The Supreme Court answered:

> Yes, an estate may profit under 18 *Del. C.* § 2704(b) where the policy was procured in part by fraud on the part of the decedent and the decedent profited from the previous sale of the policy, if the recipient of the policy benefits cannot establish that it was a victim of the fraud.[93]

In 2022, the Supreme Court of Delaware answered another set of certified questions in *Wells Fargo Bank, N.A. v. Estate of Malkin*.[94]  The first question was whether a third-party purchaser of an insurance contract that is void under Section 2704(a) and *Price Dawe* could assert either a bona fide purchaser defense or a securities defense under the Delaware UCC.[95]  The Supreme Court held those defenses are not available "because the defendants to an action brought under Section 2704(b) do not face an 'adverse claim' as the Delaware UCC defines that term."[96]  However, the Court explained that Section 2704(b) "is not inconsistent with all common-law defenses or counterclaims that a downstream purchaser of a policy might assert against an estate" and that courts must look to the "elements" of those defenses and counterclaims—"and, where appropriate, the public policy underlying the ban on human-life wagering"—to decide their viability in an action brought under Section 2704(b).[97]

The second question in *Malkin* was whether a defendant in a Section 2704(b) action can recover any premiums it paid to maintain the policy.  The Court held that such a defendant may recover the premiums it paid on the void contract if it can "establish the elements of a viable legal theory, such as unjust enrichment."[98]

---

[93] *Id.* at 966.
[94] 278 A.3d 53 (Del. 2022).
[95] *Id.* at 56.
[96] *Id.*
[97] *Id.* at 62.
[98] *Id.* at 70.

## 2. *The Policy is void ab initio.*

The factual record is clear – Ms. Barotz did not pay the premiums on the Policy, and Defendants lacked insurable interest in Ms. Barotz. The Policy was acquired *via* a STOLI scheme involving the creation of a Delaware trust, which was used as a mechanism by Defendants to acquire life insurance on Ms. Barotz.

As the Disclosure Statement and Consent form, executed by Ms. Barotz for purposes of participating in the Program, explicitly states, "[i]n no event shall the Insureds or the Insured's Spouse be obligated to pay any premiums on the Policies."[99] The Estate contends, and Defendants do not dispute that Defendants paid all the premiums for the Policy.[100]

Defendants also lacked insurable interest in Ms. Barotz at the time the Policy was acquired and subsequently sold to unrelated, third-party investors. As the *Berland* Court found, persons who have an insurable interest in an individual's life include "close family members or business associates and the 'trustee of a trust created and initially funded by' the insured."[101] Here, Defendants cannot be found to have an "insurable interest" in Ms. Barotz. Defendants were not close family members, or business associates of Ms. Barotz. Nor were Defendants the trustee of the Trust, and as already established above, at no time did Ms. Barotz "fund" or pay the premiums on the Policy.

Defendants argue that the Policy is not void *ab initio* because there are questions of fact as to whether the policy is governed by Delaware or New York law, and that the "most significant relationship" test shows that New York has the most significant relationship to the

---

[99] Mot. Ex. C.
[100] Mot. Ex. D (Defendants' Responses and Objections to Plaintiff's First Set of Requests for Admissions) at 5.
[101] *Berland*, 266 A.3d at 968.

17

parties and the events involved.[102] The Court understands Defendant's legal argument but holds that Delaware law applies here.

The present action involves the utilization of Delaware trusts, Delaware institutions, and Delaware trustees. The present claim was also brought under a state statutory cause of action, involving specific provisions of the Delaware Insurance Code. Prior caselaw involving Delaware trusts in STOLI schemes has also found that when faced with similar facts involving Delaware trusts and Delaware defendants, the choice-of-law inquiry was unnecessary and Delaware law applied.[103]

No further inquiry is necessary to find that the Policy was void *ab initio* as an illegal STOLI scheme under Section 2704(a).

### 3. *The Policy proceeds should be returned to the Estate.*

Section 2704(b) provides that "[i]f the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death . . . of the individual insured, the individual insured or his or her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them." [104] Section 2704(b) "directs that if a death benefit is paid under an insurance policy that lacks an insurable interest, the estate of the insured may recover the death benefit from the recipient."[105]

---

[102] Opp. at 29-31.
[103] *Wells Fargo Bank, N.A. v. Estate of Malkin*, 379 F.Supp. 3d 1263, 1272 (S.D. Fla. 2019) ("the Estate's claim in this case is just as clearly a statutory one, brought under a specific provision of the Delaware Code . . . Under the unique circumstances presented here . . . the Court does not find that a choice-of-law inquiry is necessary. Simply put, this is not a contract case to be governed by the law of one state or another, depending on where the contract was executed. For one thing, the Estate does not claim here that it has any contractual rights under the Policy. Nor could it—if the Estate's claim is correct, 'there is no contract at all.'"); *See also Berland v. Lavastone*, 2022 WL 15023450, at *3 (D. Del. Sept. 28, 2022) (applying Delaware law when finding that both the trust utilized as a vehicle for effectuating a STOLI scheme, and the defendants are in Delaware).
[104] *Berland*, 266 A.3d at 969.
[105] *Id.*

The *Berland* Court found that even if the decedent profited from the sale of the STOLI policy, or if the policy was acquired in part by fraud on part of the decedent in violation of Section 2704(a), the estate may still recover and profit from the policy proceeds, unless the recipient of the death benefits can establish that it was a victim of fraud. While Defendants raise arguments that Ms. Barotz was, purportedly, the sole driving force in the "fraudulent scheme" to benefit herself and her family, and that her estate should not be able to benefit from Ms. Barotz's "unclean hands," the General Assembly has declared that, for matters of public policy, an estate should receive the proceeds of a STOLI scheme, in part to discourage future purveyors and "funders" of STOLI schemes in Delaware.[106]

Here, the Estate successfully demonstrated that the Policy lacked an insurable interest at inception as a matter of law, and the Estate is entitled to the proceeds paid out to the Defendants from the Policy as a matter of public policy. Additionally, as the Estate prevails on its Section 2704(b) claim, the Court does not need to consider the Estate's claim in the alternative for unjust enrichment.

## B. DEFENDANTS' AFFIRMATIVE DEFENSES AND COUNTERCLAIMS FAIL.

Defendants assert eleven (11) affirmative defenses and six (6) counterclaims. Defendants argue that the Estate failed to meet its burden to dismiss the affirmative defenses and counterclaims, and thus, summary judgment is improper at this stage of the proceedings.

In summary, Defendants' affirmative defenses and counterclaims allege that the Estate's claims are barred under the doctrines of waiver, unclean hands, equitable estoppel, laches, and improper government/judicial taking. Defendants' counterclaims seek declaratory judgments and a breach of contract claim against the Estate and Peter Barotz, in his personal capacity.

---

[106] *Id.* at 954.

19

Here, all of Defendants' affirmative defenses and counterclaims fail because the Policy are void *ab initio*. Defendants contend that Ms. Barotz and the Estate waived any claims to the proceeds of the Policy when Ms. Barotz executed the Disclosure Statement and Consent form prior to the creation of the Trust and the Policy. Defendants also contend that Ms. Barotz actively took part in the fraudulent plan to benefit from the STOLI scheme.

However, as *Price Dawe* made clear, any life insurance policy lacking insurable interest are void *ab initio*, and the *Berland* court has already rejected arguments that an estate's claims to the proceeds of a policy acquired *via* STOLI are barred under doctrines of *in pari delecto* and unclean hands because "the General Assembly has prescribed that the estate should receive the proceeds of the policy as a matter of public policy."[107]

While, as Defendants point out, the *Berland* court did not directly address a waiver of affirmative defense in its opinion, the *Berland* court's application of Section 2704(a) against the "unclean hands" defense has the same effect here. As the Court held in the parallel *Vida* action, in light of *Price Dawe* and *Berland*, STOLI case defendants should "not be allowed to circumvent Delaware's strong public policy against STOLIs simply because Mrs. Barotz agreed to sign a boilerplate release form. To hold otherwise would legitimize the attempts of STOLI promoters to 'feign technical compliance with insurable interest statutes.'"[108]

Other affirmative defenses asserted by Defendants do not merit further discussion, as they similarly fail under the application of public policy in light of the Policy being void *ab initio*.

Defendants' counterclaims also fail as a matter of law. Defendants seek four individual declaratory judgments and a breach of contract claim against the Estate, mainly alleging the

---

[107] *Id.* at 974.
[108] *Vida*, 2022 WL 16833545, at *11.

same issues as raised in the affirmative defenses as relating to waivers of the Policy proceeds and future claims to the proceeds that may be brought by the Estate or heirs. As the Policy is void *ab initio*, the counterclaims fail as a matter of law, and no further discussion is necessary.

## VI.    CONCLUSION

For the foregoing reasons, the Estate's Motion for Summary Judgment is **GRANTED**.

Dated: December 18, 2023
Wilmington, Delaware


<u>/s/ Eric M. Davis</u>
Eric M. Davis, Judge


cc:    File&ServeExpress